## Micou, Adm'r, etc., *v.* Lamar, Ex'r, etc.

*(Circuit Court, S. D. New York.   May 5, 1881.)*

**1.** Guardian—Possession of Property in Another State—Past-Due Coupons—Value—Interest—Annual Rests—Accounting Before and After Termination of Guardianship.

It is the duty of a guardian to take into his possession, so far as he is able, the estate of his ward, wheresoever it may be; hence, where the property consisted of shares of stock in a Georgia bank, a transfer of which he could have procured to himself, and it did not appear that the guardian had taken the steps required by the laws of that state to enable a foreign guardian to remove property within the state belonging to his ward, *held*, on the evidence,—the burden of proof being upon the guardian to show that he could not get possession of the property and invest it as required by the terms of his appointment,—that the defendant was properly charged in the accounting with the value of the property.

Where the guardian transferred to his newly-appointed successor railroad and city bonds, together with the past-due coupons accompanying them, and it was agreed that the bonds were worth at the time a certain per cent. of their face value, *held*, that this was *prima facie* evidence that the over-due coupons were worth an equal percentage of their face value.

Where the wards rejected the investments made by the guardian, and demanded in money the equivalent of a proper investment, the rate of interest with which he is to be charged during the period of the guardianship is that which, with proper and safe investments, he might have realized, and therefore less than the current legal rate.

Hence, where the guardianship terminated long before the legal rate of interest in New York state was changed from 7 to 6 per cent., a guardian accounting in this court should be charged with interest during the period of the guardianship at the rate of 6 per cent.,—1 per cent. less than the current rate,—the account to be taken with annual rests. *King* v. *Talbot*, 40 N. Y. 96.

From the termination of the guardianship, however, the guardian's liability was simply to pay over presently a certain sum of money, not to invest or keep it invested.

Therefore, there is no reason for computing the account with annual rests after the termination of the guardianship, nor for charging a less rate than the legal rate of interest in this state, which was 7 per cent. down to January 1, 1880, and 6 per cent. from that date to the present time.

*George C. Holt*, for complainant.
*C. C. Beaman, Jr.*, for defendant.

CHOATE, D. J. In this case, the complainant having a decree for an accounting, the case comes up again upon exceptions to the master's report.*

The first point raised by the defendant is that the master improperly charged the defendant, in the case of each of the infants, with the value of one-third of 10 shares in the stock of the Mechanics' Bank of Augusta, in the state of Georgia. The evidence is that these shares formerly belonged to W. W. Sims, the father of the infants, who died in 1850; and that at the time of the appointment of defendant's testator as guardian they stood on the books of the bank in the name of Mrs. Abercrombie, the widow of said W. W. Sims, as his administratrix. From February, 1856, to February, 1859, defendant's testator, as guardian of each of the infants, received from the bank one-third of the dividends on these 10 shares, and thereafter, from the death of the mother, Mrs. Abercrombie, until the war, when the stock became worthless, he received from the bank, as guardian of each of the infants, one-half of said dividends. It appears by a memorandum in the guardian's account that in January, 1856, the guardian applied to the bank for a transfer to him, as guardian of the infants, of the two-thirds of the 10 shares, but the bank, though willing to pay the dividends and continuing thereafter to do so, as above stated, refused to make a transfer of the stock itself. I think it is a proper inference from this evidence that the real beneficial interest in one-third of these 10 shares was in each of the infants after the death of their father. The great lapse of time since his death, and the absence of any evidence that the property was needed for payment of his debts, warrant the conclusion that the guardian could, upon requesting it of Mrs. Abercrombie, the administratrix, have had the estate so far settled as to have procured a transfer of the infants' interest to him as guardian. It is argued that the guardian was under no obligation to reduce property of this kind belonging to his ward in another state to his possession; that the office of guardian is local, and as to property out of the state, under whose laws

*See 1 FED. REP. 14.

he holds his appointment, he is only chargeable with that of which he actually takes possession. I cannot subscribe to this doctrine. I think it is the duty of the guardian to take into his possession, so far as he is able, the estate of his ward, whoever it may be, and that he is not to be justified in abandoning any part of it because it happens to be outside of the jurisdiction of the state wherein he is appointed. It is objected, however, that the laws of Georgia interposed an obstacle to prevent the guardian from reducing this stock to possession and removing it from the state, or selling it and investing the proceeds as required by the law of New York. There was a short period, from the spring of 1859 to January, 1860, when the infants resided in Georgia with their relatives. After that they resided in Alabama, and before that, from shortly after the appointment of the guardian till the spring of 1859, when their mother, Mrs. Abercrombie, died, in Connecticut with their mother. It appears that by the law of Georgia a foreign guardian cannot remove property within the state belonging to his ward without the consent of the ordinary. The matter appears to be committed to the discretion of the ordinary. I cannot conceive of any reason why the ordinary should refuse his consent, unless it were during the brief period that the wards resided in that state. It does not appear that in this case the guardian ever applied for his consent. And, the burden being upon the guardian to show that he could not get possession of the property and invest it as required by the terms of his appointment, I think the defendant has failed to sustain that burden, or to show that there was any obstacle growing out of the laws of Georgia which prevented his getting possession of the stock and investing it properly. It is also claimed by defendant that he should be allowed a deduction from the value of this stock for the expense that would be necessarily incurred in reducing it to possession. There is no proof what the expense would be, or that it would be more than nominal. It is not to be presumed that the mother of the wards would have interposed any difficulties, or that the guardian would have been charged with any expenses in ob-

taining a transfer of the stock. The defendant was therefore properly charged with this item.

The next question is whether the master properly charged the defendant, in the case of each infant, with one-sixth of the value of these same shares of stock, and with one-half of the value of nine shares of the stock of the Bank of Commerce, a Georgia corporation. These stocks belonged to Mrs. Abercrombie, the mother of the wards, in her life-time. One-third interest in the 10 shares of the Mechanics' Bank came to her from her husband, W. W. Sims, and the 10 shares stood in her name as his administratrix, as above stated. The nine shares were purchased by her, and stood in her name till her death, in the spring of 1859. On her death, her husband, Mr. Abercrombie, became entitled to her personal property. The title of each of the wards in one-half of their mother's interest in these two lots of stock is derived through what is claimed to have been a surrender by Mr. Abercrombie to her two children of their mother's interest in the same. The evidence that such a surrender or transfer was made is chiefly a letter of the guardian to the grandmother of the two children, dated May 23, 1859,—soon after the death of Mrs. Abercrombie, their mother,—and the acts of the parties in apparent conformity with what the letter shows had been done by Mr. Abercrombie in respect to such a surrender. In this letter defendant's testator says:

"You were informed through Mary Jane that Rev. Mr. Abercrombie had offered to surrender the property he acquired through Mrs. Sims, and which had belonged to her former husband, to the two children. Subsequently he made a transfer, to take effect *at his death*, and two notes, one to each of the girls, payable six months after his death, for $2,750 each. Again he changed his mind and offered to make a surrender at once, and gave me deeds to two three-story houses in Brooklyn, E. D., 17 feet only, and subject to $4,500 mortgage on each, with last year's taxes and some arrears for repairs, and only one house tenanted, at $550 rent. After inspecting the houses and taking the opinion of a judicious friend, which confirmed my own, I thought it best to decline the proposition in that shape and hold on to the notes, $2,750 each, though unsecured, because the encumbrances on the property might entail more outlay than income for the children. This morning I have a letter from him without any further proposition, which I hoped he would have made; so that I retain the two notes and a transfer of all his interest derived through his wife to the balance of the

estate. This will include her one-third part of the 10 shares Mechanics' Bank stock, and nine shares of the Bank of Commerce, and her third of the notes received for the Florida land. I hope the children are improving, etc. * * * Their income is limited, without the notes of Rev. Mr. A. and those for the land, to between $500 and $600 each, so long as the banks continue to pay regular dividends as they have done."

From the date of that letter defendant's testator charged himself in his accounts as guardian with the receipt of the dividends on the said one-third of the ten shares Mechanics' Bank, and on the nine shares Bank of Commerce, one-half in the account with each of the wards. Among the assets and papers transferred by the defendant's testator to Mr. Micou, upon the appointment of the latter as guardian in 1867, as appears by the receipt of Mr. Micou given therefor, are the following:

"The conveyance of Richard M. Abercrombie, dated tenth of May, 1859, of all he then had or might have in the estate of W. W. Sims, in right of his late wife, then deceased;" "two notes, each for $2,750, dated April 15, 1859, of the said Rev. Richard M. Abercrombie, payable six months after his decease, without interest;" "No. 136, Bank of Commerce certificate for nine shares stock for Mrs. M. C. Abercrombie, eighth July, 1857."

I think it is a fair inference from the letter, the recitals of Mr. Micou's receipt, and the continued collection of the dividends by the guardian, that Mr. Abercrombie made an immediate surrender to the guardian of his wife's interest in the 10 shares of the Mechanics' Bank stock, and the nine shares Bank of Commerce stock. Without these other circumstances the letter might have been taken to import that his surrender of these stocks was to take effect only at his death; but in the light of these circumstances, which strongly tend to show that a present surrender, at least of these two pieces of property, was made, I think the conclusion of the master was correct that defendant's testator could, by proper effort on his part, have reduced these stocks to his possession. It is true that to do so, and to vest the legal title in the guardian, it would have been necessary for some one to have taken out letters of administration on the estate of W. W. Sims, and also on the estate of Mrs. Abercrombie; but it is not to be presumed, in the absence of evidence, that this could not

have been done. Nor do the circumstances tend to show that this property was needed to pay the debts of Mrs. Abercrombie. Such a supposition is inconsistent with the terms of the letter of Mr. Lamar. It appeared that Mr. Abercrombie is living, and he was not called as a witness. There was at least *prima facie* evidence that the guardian had under his control, and so within his reach that he could have reduced them to possession, these two lots of stock, formerly belonging to the mother of his wards, and his failure to call Mr. Abercrombie to show that the surrender of them was not immediate, if that was the fact, does not aid his case. The same suggestions relative to the expense of obtaining possession of these stocks, and relative to any difficulty growing out of the laws of Georgia, apply to these items as to the interest of each of the wards in the one-third of the 10 shares Mechanics' Bank derived from her father.

The next question raised is whether the defendant's testator should receive any credit for past-due coupons on one bond of the East Tennessee, Virginia & Georgia Railroad, and three bonds of the city of Memphis, which were among the securities turned over to Mr. Micou, the new guardian. It is insisted by the plaintiff that there is no evidence that at the time they were so transferred they had any value. It appears that about two years thereafter they became collectible. I think, however, there is evidence that they had value at the time of the transfer, and this is the agreed fact, that the bonds to which they belonged were then worth a certain per cent. of their face. In the absence of any evidence affecting the validity of these over-due coupons, I think it may safely be assumed they were worth at least an equal percentage on their face value. It is to be presumed that they have the same security for their payment as the principal of the bond, with the added advantage of being already due,—a circumstance which attaches to the possession of them remedies which the bonds themselves may not have carried with them. I think, therefore, the defendant's claim for this credit is reasonable, and should be allowed.

I see no reason whatever for allowing a credit for the se-

curities turned over to the new guardian at the highest rate at which they could at any time afterwards have been sold, and the exception on the ground that such an allowance was not made must be overruled.

The circumstances of this case are not such that the guardian should be refused his commissions. If he accounts fully for all the estate of his ward, the plaintiff gets a full indemnity, though the commissions are allowed. There was no wilful misconduct on the part of the guardian. *King* v. *Talbot*, 40 N. Y. 96.

The remaining questions submitted relate to the rate of interest and the mode of computing it. This matter was somewhat considered upon the settlement of the interlocutory decree, and the master was directed to compute interest at the rate of 5 per cent., with annual rests, the rate being fixed at the uniform rate of 1 per cent. less than the present legal rate of interest in this state. I think, however, there is good reason to discriminate as to the rate of interest between the period of the guardianship and the period subsequent thereto. The guardianship of one of the infants terminated in 1864, on her death; that of the other in 1872, on her attaining her majority. In both cases the guardianship terminated long before the legal rate of interest in this state was reduced from 7 per cent. to 6 per cent. The rate of interest with which a trustee should be charged during the period of the trust, under similar circumstances, was very carefully considered by the court of appeals in the case of *Talbot* v. *King, ut supra,* and it was fixed at 6 per cent., or 1 per cent. below the legal rate of interest in this state. If that decision is not binding on this court, it is entitled to very great consideration, and should, I think, be followed; and the change made in the legal rate, so long after the termination of these guardianships, does not affect the question of the rate during the period of the guardianship. During the guardianship the account is to be taken with annual rests. But, with respect to the period subsequent to the termination of the trust, a different principle applies. The wards having rejected the investments made by the guard-

ian, and demanded the equivalent in money of what would have been a proper investment, the rate of interest with which he is to be charged during the period of the guardianship is that which, with proper and safe investments, he might have realized, and therefore less than the current legal rate, as explained in the case of *Talbot* v. *King*, above referred to. From the termination of the guardianship, however, in the position assumed by the wards of rejecting the investments, the liability of the guardian was simply to pay over a certain sum of money. His duty was, not to invest it, or to keep it invested, but to pay it to the wards or their legal representatives on demand. It was due presently, and, like other sums due presently, carries interest without annual rests at the rate fixed by law therefor. The guardian could have relieved himself at any time by payment. The wards could have had their money at any time on demand. As to this period, therefore, there is no reason for computing the account with annual rests, nor for charging a less rate than the legal rate of interest, which was 7 per cent. down to January 1, 1880, and 6 per cent. from that date to the present time.

Other questions, which might have been raised upon the exceptions as drawn, have not been presented on the argument, and, as I understand it, are not now insisted upon.

Let a decree be entered in conformity with this opinion.